```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA           :

        - v -                      :
                                            13 Cr. 143 (LTS)
JUDITH P. FADUL,                   :

            Defendant.             :

- - - - - - - - - - - - - - - - - -x
```

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S PRETRIAL MOTIONS**

                                   FEDERAL DEFENDERS OF NEW YORK, INC.
                                   Attorney for Defendant
                                   **JUDITH FADUL**
                                   52 Duane Street - 10th Floor
                                   New York, New York  10007
                                   Tel.: (212) 417-8792

**JONATHAN MARVINNY, ESQ.**
  Of Counsel

TO:   PREET BHARARA, ESQ.
      United States Attorney
      Southern District Of New York
      One St. Andrew's Plaza
      New York, New York  10007
      Attn: **Amy Garzon, Esq.**
           Assistant United States Attorney

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

     - v -                        :
                                           13 Cr. 143 (LTS)
JUDITH P. FADUL,                  :

          Defendant.              :

- - - - - - - - - - - - - - - - - x
```

## PRELIMINARY STATEMENT

Defendant Judith Fadul respectfully submits this Memorandum of Law in support of her pretrial motions pursuant to the Fourth and Fifth Amendments, and Federal Rule of Criminal Procedure 12, to suppress physical evidence and statements. For the reasons described below, the Court should grant Ms. Fadul's motions in full or, in the alternative, conduct an evidentiary hearing.

## STATEMENT OF FACTS

Defendant Judith Fadul is charged with, *inter alia*, a conspiracy to distribute drugs, possession of a firearm in furtherance of that conspiracy, and possession of counterfeit United States currency. The case against Ms. Fadul began with an unlawful, warrantless search of her apartment.

<u>Police illegally enter and search Ms. Fadul's apartment</u>

Late on the evening of September 10, 2012, multiple NYPD officers arrived at Judith Fadul's apartment at 2825 Claflin Avenue, Apartment 4K, in the Bronx. They had no search warrant,

but were supposedly there for the purpose of investigating marijuana complaints from neighbors. See Affidavit of Detective Greg Larsen ("Larsen Aff."). Ms. Fadul was not home when they arrived, Declaration of Judith Fadul ("Fadul Decl.") ¶ 4, but her daughter, Yazmin Delarosa, and several other friends and family members were.

Ms. Delarosa answered a knock on the door and saw her sister, Celeste Crespo, Ms. Crespo's boyfriend, and their daughter standing outside. Declaration of Yazmin Delarosa ("Delarosa Decl.") ¶ 4. Behind them stood at least four NYPD officers. Id. Apparently, the officers had encountered Ms. Crespo and the others, who had just exited Apartment 4K, in the hallway and had walked them back to the apartment.

At the front door, the officers repeatedly demanded entry to the apartment. Id. Ms. Delarosa refused their requests, and asked them over and over if they had a warrant. Id. They did not. Nevertheless, at some point, officers pushed Ms. Crespo and the others standing in the doorway into the apartment and entered behind them. Id. at ¶ 5. No one ever gave the officers permission to enter the apartment. Id.

A couple of officers ordered those inside the apartment into the living room, and proceeded to conduct a full-blown search of the premises. Id. at ¶ 6. Ms. Delarosa heard them enter all of the bedrooms and open various drawers, closets, and

2

other closed containers. Id.

In the midst of that warrantless search, Ms. Fadul returned home with her boyfriend, Kenneth Garcia, and her son, Randy Delarosa. Fadul Decl. ¶ 4. She encountered various friends and family members being held together in the living room, including, among others: her fifteen-year-old son, Brandon, eighteen-year-old Yazmin Delarosa, twenty-two-year-old Celeste Crespo, and her three-year-old granddaughter, Skyla Custodio. Id. at ¶ 5. The police ordered Ms. Fadul, Randy, and Kenneth to remain in the living room with the others while they continued to search the apartment. Id.

Police arrest everyone in the apartment and coerce Ms. Fadul into waiving her rights

After allegedly encountering contraband only in Ms. Fadul's bedroom, including a gun and drugs, the police nevertheless proceeded to arrest everyone in the apartment, except for three-year-old Skyla. The group of arrestees, all eight of them, including Ms. Fadul's two fifteen-year-old sons, were chained together, led out of the building, and transported to the police precinct. Id. at ¶ 6.

At the precinct, at around 2:00 a.m. on September 11, the officers told Ms. Fadul that she should sign a form granting them the right to return to her apartment and search it again. The police told her that if she did not sign the form they would

3

call ACS to come and take her children away from her. Id. at ¶ 7. Ms. Fadul was terrified at the possibility of losing her children if she did not do as the police requested. Id. Under those coercive circumstances, and with the knowledge that everyone in the apartment, including her young children, was still under arrest for the items that police had found, she signed a consent-to-search form and waived her Miranda rights. Subsequently, she allegedly made incriminating statements regarding some of the items found in her apartment.

Detective Larsen applies for a search warrant

Despite having a freshly-signed consent-to-search form in their possession, the police decided not to immediately re-search the apartment. Instead, they waited until court opened and asked a Bronx County judge to sign a search warrant. In his affidavit in support of the search warrant, Detective Larsen claimed that he and the other officers were "invited into the apartment by Yazmin Billarosa [sic]" and that, once inside, had observed contraband in plain view. Larsen Aff. He added that "[m]embers of the New York City Police Department have secured the premises and are waiting for the issuance of this warrant." Id. The warrant was issued, and the NYPD again searched the apartment.

4

Eventually, charges were dropped against everyone who was arrested on the night in question except Ms. Fadul and Kenneth Garcia.

The government obtains search warrants for the phone and laptops

During their search of Ms. Fadul's apartment on September 11, 2012, in addition to the items that Ms. Fadul is now charged with unlawfully possessing, police recovered several cell phones allegedly registered to Ms. Fadul, and four laptop computers from Ms. Fadul's bedroom. According to the government, Ms. Fadul made statements admitting that the laptops were hers and that she paid the service plan for the cell phones. Months after Ms. Fadul's arrest, the government obtained search warrants granting them permission to search the contents of those cell phones and computers. The government subsequently conducted those searches and has indicated that it will seek to introduce at trial some of the digital content it recovered.

**ARGUMENT**

**POINT I**

**The police's initial, warrantless search of Ms. Fadul's apartment was unlawful where they did not obtain valid consent.**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Physical entry by police into a person's home is the "chief evil against which the

5

wording of the Fourth Amendment is directed." United States v. U.S. Dist. Court for Eastern Dist. of Mich., 407 U.S. 297, 313 (1972). Indeed, "respect for the sanctity of the home . . . has been embedded in our traditions since the origins of the Republic." Payton v. New York, 445 U.S. 573, 601 (1980).

The entry and search of a person's home without a warrant supported by probable cause is per se unreasonable, with only a few specifically established and well-delineated exceptions. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); Katz v. United States, 389 U.S. 347, 357 (1967). Consent is one such exception, and the government seeks to rely on it in Ms. Fadul's case.

But no one consented to the police's entry into or search of Mr. Fadul's apartment. Yazmin Delarosa makes clear that she "refused to let them in and asked them repeatedly if they had a warrant." Delarosa Decl. ¶ 4. Of course, they did not, but nevertheless barged their way into the apartment. Moreover, even if Ms. Delarosa did consent to their entry into the apartment (which she did not), the police far exceeded the scope of that consent by conducting a full-blown search of the entire apartment, including entering all the bedrooms and opening numerous closed containers. To be clear, Detective Larsen has claimed only that Ms. Delarosa "invited" police into the apartment, Larsen Aff., not that she granted them permission

6

to thoroughly search all of the bedrooms and closed containers within them. Cf. United States v. Guzman, F. Supp. 2d 434, 441 (S.D.N.Y. 2010) (finding that a police officer who had entered defendant's apartment with the consent of defendant's girlfriend exceeded the permissible scope of that consent when he took a bottle down from a shelf and examined it, since the movement and examination of the bottle was not necessary to protect the safety of the officers or anyone else on the scene).

As a result of the police's illegal entry and search of the apartment, all fruits of that improper search, including all statements made by Ms. Fadul, and all physical evidence discovered in the initial and the subsequent searches, must be suppressed. See, e.g., Segura v. United States, 468 U.S. 796, 804 (1984) ("[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'") (citations omitted); Wong Sun v. United States, 371 U.S. 471, 491-92 (1963) (requiring suppression of evidence derived from an illegal arrest or entry).

## POINT II

**Ms. Fadul's purported consent to search her apartment was the fruit of the police's prior unlawful search and was, in any event, involuntary.**

After illegally entering and searching Ms. Fadul's apartment, police arrested everyone in the apartment except Ms. Fadul's three-year-old granddaughter. Police then chained the arrestees together and transported them to the precinct, where police separated Ms. Fadul and interrogated her. During that questioning, Ms. Fadul signed a consent-to-search form purporting to give the officers permission to return to her apartment and conduct the very same search that they had already illegally performed. For the reasons discussed, however, Ms. Fadul's consent to search was tainted by the police's prior illegal search and was, in any event, involuntary.

**A.   Ms. Fadul's consent to search was tainted by the police's prior illegal search of her apartment.**

First, under the "fruit of the poisonous tree" doctrine articulated in Wong Sun, Ms. Fadul's consent to search her apartment, obtained by police almost immediately following their illegal search, was invalid unless "the taint of the initial entry had been dissipated before the 'consent[]' to search [was] given." United States v. Oguns, 921 F.2d 442, 447 (2d Cir. 1990) (quoting United States v. Vasquez, 638 F.2d 507, 527 (2d Cir.

8

1980)); see also United States v. Barone, 721 F. Supp. 2d 261, 278 (S.D.N.Y. 2010) ("[T]he 'fruit of the poisonous tree' doctrine applies to consents following an illegal entry as well as to physical evidence seized.").

In assessing whether the taint of the police's prior illegal search has dissipated by the time consent is given, courts generally look to four factors: whether a Miranda warning was given, the "temporal proximity" of the illegal entry and the alleged consent, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. See Oguns, 921 F.2d at 447 (citations omitted). Here, these factors weigh heavily in favor of a finding that the taint of the police's initial illegal search had not dissipated when Ms. Fadul gave her consent to allow the police to once again search her apartment.

First, it is unclear whether police gave Ms. Fadul Miranda warnings prior to her signing the consent-to-search form. The written form itself certainly contains no such warnings, see Exhibit E, and nowhere else has the government indicated that police in fact gave Miranda warning prior to Ms. Fadul signing the form. Next, police obtained Ms. Fadul's consent very shortly after their prior illegal search of her apartment. Indeed, Ms. Fadul signed the form at 1:50 a.m. on September 11, 2012, see

9

id., mere minutes after she and everyone else inside the apartment were arrested and hauled to the precinct.

Third, the only intervening circumstances between the police's illegal search and Ms. Fadul signing the form were the arrest of most of Ms. Fadul's family and their transport in handcuffs to the precinct – hardly the kind of intervening circumstance that might suffice to conclude that the taint of the police's misconduct had dissipated. Finally, the police's misconduct throughout the evening was flagrant and purposeful. Indeed, as discussed below, the police deliberately coerced Ms. Fadul into signing the consent form by arresting everyone inside the apartment and threatening to take Ms. Fadul's children away from her if she did not sign. See Barone, 721 F. Supp. 2d at 278 ("Analytically, then, in addition to being direct 'fruit' of the illegal entry, Barone's consent is also derivative 'fruit,' because Agent Gaeta exploited the tainted [evidence observed] in seeking further consent to search.").

Under all of these circumstances, it is impossible to conclude that the taint of the police's illegal search of Ms. Fadul's apartment had dissipated by the time she signed the consent-to-search form. Ms. Fadul's consent was invalid.

**B.   Ms. Fadul's purported consent was involuntary.**

Even if the taint of the police's prior illegal search had dissipated by the time Ms. Fadul consented to another search of

10

her apartment, her consent, standing on its own, was plainly involuntary. Of course, when the government seeks to rely on consent to justify a search, it must prove that the consent was freely and voluntarily given, and not the product of coercion. Schnecklot v. Bustamonte, 412 U.S. 218, 226-27 (1973). In determining whether a defendant's will was overborne in a particular case, a court should assess the totality of the surrounding circumstances, including both the defendant's characteristics and the details of the interrogation. Id. at 226. Consent to search obtained from a person in custody requires more careful scrutiny, and an individual's consent is not voluntary when the person merely acquiesces and submits to apparent lawful authority. Id. at 227.

   Here, Ms. Fadul – who was in custody at the time – signed the consent-to-search form under highly coercive circumstances. Ms. Fadul had just witnesses her entire family, including her young children, get arrested after police encountered contraband in Ms. Fadul's bedroom. Moreover, at the precinct, police told her that if she did not sign the form they would call ACS to take her children away from her. Fadul Decl. ¶ 7. Confronting her with the evidence they had found, police told Ms. Fadul – who has no prior criminal record whatsoever – that she would serve twenty years in prison. Id. Under those circumstances, the

government simply cannot prove that Ms. Fadul's consent was given voluntarily.

### POINT III

**Ms. Fadul's statements should also be suppressed.**

The Court should suppress all statements purportedly made by Ms. Fadul following her arrest, either as the fruit of the police's unlawful search or because the government cannot prove that Ms. Fadul knowingly and voluntarily waived her right to remain silent.[1]

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." It thus bars the use of any statements at trial that were made by a criminal defendant involuntarily. See, e.g., United States v. Patane, 542 U.S. 630, 640 (2004). See also 18 U.S.C. § 3501(a) (requiring that the government establish the voluntariness of any confession before it is admitted against the defendant in a criminal trial). A statement is "involuntary" if it was obtained by any type of physical or psychological coercion, or by some improper inducement that resulted in a defendant's will being overborne. See, e.g., Haynes v. State of

---

[1] The government's discovery does not make clear whether Ms. Fadul made her statements to police before or after she purportedly waived her Miranda rights. In any event, Ms. Fadul moves to suppress any pre-warnings statements on the ground that they were the product of custodial interrogation and therefore elicited in violation of Miranda.

12

Washington, 373 U.S. 503, 513-14 (1963); Lynumn v. Illinois, 372 U.S. 528, 534 (1963).

The government has the burden of establishing that any statements made in custody are voluntary, and that the individual knowingly and willingly waived her Miranda rights. See, e.g., Colorado v. Connelly, 479 U.S. 157, 164, 168-69 (1986); United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995). To determine voluntariness, courts consider the "totality of all the surrounding circumstances, including the [defendant's] characteristics, the conditions of interrogation, and the conduct of law enforcement." United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991); see also Parsad v. Greiner, 337 F.3d 175, 183 (2d Cir. 2003). As with consent, relevant characteristics include a defendant's age, her mental capabilities, her familiarity with the criminal justice system, and any coercive or threatening actions by law enforcement. See, e.g., United States v. Egipciaco, 389 F. Supp. 2d 520, 524 (S.D.N.Y. 2005); United States v. Zerbo, 98 Cr. 1344 (SAS), 1999 WL 804129, at *8 (S.D.N.Y. Oct. 8, 1999).

We have already discussed how Ms. Fadul's purported consent to search her apartment was involuntary and the product of police coercion. For the same reasons – Ms. Fadul was threatened that everyone in the apartment would be prosecuted, that her children would be taken away, and that she herself would serve

13

twenty years in prison – Ms. Fadul's statements were similarly involuntary. See, e.g., United States v. Sixto Ortiz, No. 12 Cr. 791, 2013 WL 1908897 (S.D.N.Y. May 9, 2013) (suppressing defendant's confession where officer had previously threatened to arrest defendant's mother and aunt for a gun found in defendant's closet). As a result, the Court should suppress them.

### POINT IV

**The Court should suppress evidence recovered pursuant to the search warrant where the warrant was tainted by the police's prior unlawful search and where Detective Larsen made knowingly false statements in his affidavit.**

The Court should suppress evidence recovered pursuant to the police's search of Ms. Fadul's apartment after they secured a search warrant because that warrant was wholly tainted by the police's prior illegal search of the apartment. Indeed, Detective Larsen's affidavit in support of the search warrant was based entirely on observations police made during that prior search. Under Wong Sun, then, the search warrant and the evidence recovered after its issuance are "fruits" of the police's initial constitutional violation.

Additionally, the Court should deem the search warrant invalid because Detective Larsen made knowingly false statements in his affidavit and because, without those statements, there was no probable cause to issue the warrant. See Franks v.

14

<u>Delaware</u>, 438 U.S. 154, 155-56 (1978). Specifically, Detective Larsen falsely claimed that Yazmin Delarosa "invited" police into the apartment where, in fact, Ms. Delarosa refused the police entry and repeatedly demanded to see a warrant. Of course, the police had no warrant but nevertheless barged into the apartment without permission, a fact that Larsen did not recount in his affidavit.

## CONCLUSION

Because of the illegal actions of law enforcement in this case, both physical evidence and statements purportedly made by Ms. Fadul should be suppressed.

Dated:    New York, New York
          July 1, 2013


                                    Respectfully submitted,
                                    Federal Defenders of New York, Inc.



                              By:   /s/Jonathan Marvinny
                                    **JONATHAN MARVINNY, ESQ**
                                    Attorney for Defendant
                                    **JUDITH FADUL**
                                    52 Duane Street - 10th Floor
                                    New York NY 10007
                                    Tel.: (212) 417-8792