```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  04/21/2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                               :

UNITED STATES OF AMERICA,          :
                                               :

        -v-                      :       S2 13 Cr. 143 (JMF)
                                               :

JUDITH P. FADUL et al.,             :      <u>AMENDED OPINION</u>
                                           :      <u>AND ORDER</u>

                   Defendants.      :

                                                 :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       Defendants Judith Fadul, Kenneth Garcia, and Yasmin Delarosa, charged with drug, gun, and counterfeiting offenses in a six-count superseding indictment (Docket No. 62), move to suppress evidence seized during a search of Fadul's apartment.  Their motion implicates an issue of Fourth Amendment law that has divided the Courts of Appeals and remains unsettled in the Second Circuit — namely, whether, and under what circumstances, law enforcement officers may engage in a warrantless "protective sweep" of a home where they initially gained entry to that home by consent.  The issue is a difficult one because it requires balancing competing concerns.  On the one hand, allowing law enforcement officers to engage in a warrantless protective sweep where they have entered in the first instance based on consent might enable and encourage officers to obtain that consent as a pretext for conducting a warrantless search.  It also threatens to undermine the well-established principle that a person can limit the scope of his or her consent to search to a particular area.  On the other hand, categorically prohibiting law enforcement officers from taking limited steps to ensure their safety if they have entered a home based on consent would undoubtedly jeopardize the safety of officers and, by extension, cause some officers to forgo consent entries altogether.

Balancing those concerns, the Court holds that, under certain circumstances, law enforcement officers may engage in a protective sweep where they gained entry through consent in the first instance.  But the Court also concludes that, in the circumstances presented in this case, the protective sweep at issue was unlawful.  Accordingly, and for the reasons stated below, Defendants' motion to suppress is granted.

## FACTS

### A.  Background

The instant case arises from a search of Fadul's apartment, Apartment 4K at 2825 Claflin Avenue in the Bronx, New York (the "Apartment"), by members of the New York City Police Department ("NYPD") on or about September 10, 2012.  As discussed in detail below, the circumstances of the police officers' initial entry into the Apartment and subsequent search are heavily disputed.  But there is no dispute that, once inside, the police officers observed and ultimately seized a firearm, drugs, drug paraphernalia, counterfeit United States currency, and counterfeiting equipment.  On the night of the search, everyone in the Apartment — including Fadul, Garcia, and Delarosa — was arrested by the NYPD.  On January 30, 2013, Fadul was re-arrested by federal agents and subsequently charged with two counts of counterfeiting.  (Docket No. 7).[1]  On March 25, 2013, Garcia was re-arrested by federal agents and subsequently charged, in a different indictment, with one count of unlawful possession of a firearm by a felon.  (13 Cr. 257, Docket No. 6).  Finally, to the extent relevant here, on July 2, 2013, Delarosa was re-arrested by federal agents and charged (along with Fadul and Garcia) with one count of conspiracy to distribute or possess with intent to distribute controlled substances.  (Docket No.

---

[1]     Unless otherwise noted, all docket citations are to the docket in this case.  "Tr." refers to the transcript of the evidentiary hearing held on February 3-6, 2014; "[Date] Tr." refers to the transcript of proceedings from the relevant date; and "GX" refers to a Government exhibit at the hearing.

18).  (On or about November 7, 2013, the grand jury returned a superseding indictment charging six additional defendants.  They are not involved in the present motion.)

For reasons that will become clear, the early procedural history of this case is important.  As noted, Fadul was the first of the three moving Defendants to be charged federally.  The Honorable Laura Taylor Swain — who was initially assigned Fadul's case — set April 25, 2013, as a deadline for the filing of defense motions and scheduled a pretrial conference for April 23, 2013.  (March 6, 2013 Minute Entry; Docket No. 10).  On April 23, 2013, at the request of the parties, Judge Swain extended Fadul's deadline to file motions until July 2, 2013.  (Apr. 23, 2013 Tr. at 5).  Shortly thereafter, this Court — which was initially assigned Garcia's case — set June 5, 2013, as the deadline for Garcia to file any motions.  (13 Cr. 257, May 22, 2013 Oral Order).  On June 4, 2013, Garcia filed a motion to suppress evidence, including the evidence seized in the search of the Apartment on September 10, 2012.  (13 Cr. 257, Docket Nos. 8-10).  In support of the motion, Garcia submitted a sworn affidavit from himself and a sworn affidavit from Delarosa.  (13 Cr. 257, Docket No. 9-1, Exs. E & G).  In the latter, dated May 31, 2013, Delarosa stated that the officers had "pushed" their way into the Apartment without a warrant or consent.  (13 Cr. 257, Docket No. 9-1, Ex. E, ¶¶ 4-5).

Based on the Government's concession that an evidentiary hearing was necessary to resolve Garcia's motion, the Court scheduled a hearing for July 2, 2013.  (13 Cr. 257, June 12, 2013 Minute Entry).  On June 21, 2013, in advance of the hearing, the Government filed its memorandum in opposition to Garcia's motion.  (13 Cr. 257, Docket No. 15).  In that memorandum, the Government argued that Delarosa consented to the police officers' initial entry into the Apartment.  (13 Cr. 257, Docket No. 15, at 3).  In addition, the Government first advanced the argument it presses here: that, *after* entering Apartment with Delarosa's consent,

the police officers engaged in a lawful protective sweep based, in part, on the fact that a male occupant of the apartment "moved toward the back of [the apartment]" and tried to close the door to one of the bedrooms.  (13 Cr. 257, Docket No. 15, at 3; *see also id.* at 10-12).

Just before the evidentiary hearing was to take place in Garcia's case, the Government obtained a superseding indictment in Fadul's case charging her, Garcia, and Delarosa with drug, gun, and counterfeitting offenses.  (Docket No. 18).  The Government then sought and obtained dismissal of the separate indictment against Garcia alone.  (13 Cr. 257, Docket No. 21).  In the meantime, on July 1, 2013, Fadul filed her own motion to suppress evidence, including the evidence seized in the search of the Apartment on September 10, 2012.  (Docket Nos. 14-16; *see also* Docket No. 44 (renewing the motion)).  That motion was supported by sworn declarations from Delarosa (the same declaration that was previously submitted in support of Garcia's motion in 13 Cr. 257), and Fadul herself, dated April 23, 2013 (the date of the earlier pretrial conference before Judge Swain, two days before the first motion deadline).  (Docket No. 15-1; *see also* 13 Cr. 257, Docket No. 9-1).  To the extent relevant here, Fadul alleged that she, Garcia, and her fifteen-year-old son, R.D.,[2] had gone to the grocery store on the night of September 10, 2012, and returned home to find the police "were already searching" the Apartment.  (Docket No. 15-1, ¶ 4).  Thereafter, Garcia and Delarosa filed their own motions seeking to suppress the evidence seized during the search of the Apartment as well.  (Docket Nos. 47, 57).[3]

---

[2]    The name of Fadul's son (and his twin brother, discussed below) is redacted pursuant to Rule 49.1(a) of the Federal Rules of Criminal Procedure.

[3]    In their motions, the three moving Defendants sought various forms of relief separate and apart from suppression of the evidence seized during the search of Fadul's apartment on September 10, 2012.  (Docket Nos. 16, 49, 59, 80).  The Court resolved all other aspects of the motions by order dated December 12, 2013 (Docket No. 94), and in oral rulings at the beginning and end of the evidentiary hearing.  (Tr. 3-4, 633-45).  Thus, this Opinion and Order concerns only the motion to suppress evidence seized in the apartment on September 10, 2012.

**B.  The Hearing**

The Court held a three-day evidentiary hearing in connection with Defendants' motions to suppress beginning on February 3, 2014.  With respect to the issue addressed in this Opinion and Order, the Government called three witnesses: Detective Michael Smyth, Sergeant Patricio Ovando, and Detective David Rojas, all from the NYPD.  Defendants called one witness, Celeste Crespo, Fadul's daughter and Delarosa's sister.

As will become clear, the parties' versions of what happened on the night of September 10, 2012, differed dramatically.  In the Government's version, after receiving an anonymous complaint about marijuana smoking on the premises, the officers requested permission to enter the Apartment, and Delarosa granted it, either explicitly by saying "ok" or implicitly by opening the door and allowed the officers to enter.  Inside the Apartment, the officers found themselves outnumbered, with at least one person unaccounted for in the back of the Apartment, and a strong odor of marijuana.  On top of that, one occupant of the Apartment —Fadul's son, R.D. — immediately headed from the entrance area toward a bedroom in the rear of the Apartment, refused to stop despite repeated orders to do so, and tried to close the door to the bedroom when an officer confronted him there.  A subsequent search of that bedroom resulted in the seizure of the gun, drugs, drug paraphernalia, and counterfeiting equipment.

In Defendants' version, by contrast, the officers requested permission to enter but, when repeatedly asked if they had a warrant, forced their way into the Apartment.  According to Defendants, no one in the Apartment was smoking marijuana that night and, even more significant, no one moved in the direction of the first bedroom.  In fact, Defendants contend that R.D. — the person alleged by the police to have moved toward the bedroom — was not even present in the Apartment when the police arrived, as he had gone grocery shopping with Fadul

and Garcia.  Defendants maintain that, immediately upon entering and without any reason for suspicion beyond a months' old complaint about marijuana smoking on the premises, the officers engaged in a full-blown search of the Apartment, yielding the gun and other contraband.

The Court will summarize each party's version of the events in turn.

### 1. The Government's Case

The circumstances that led to the police officers' visit to the Apartment are not seriously in dispute.  According to the Government's witnesses, the case started with a civilian complaint, received on July 19, 2012, that one or more people were smoking marijuana in the Apartment every night from 11 p.m. to 4 a.m.  (Tr. 87, 243, 392-93).  Detective Rojas, who was assigned to investigate the complaint, ran database checks suggesting that, at least as of June 2012, Fadul, Delarosa, and Crespo lived in the Apartment.  (Tr. 155, 392, 399).  Then, on September 10, 2012, at approximately 11 p.m. a field team of four officers dressed in plain clothes went to visit the Apartment: Sergeant Ovando, Detective Smyth, Detective Rojas, and Detective Gregory Larsen.  (Tr. 86-87, 90).  That field team had worked together, "day in and day out," for two years; Sergeant Ovando was the team leader.  (Tr. 146-47, 329-30).  According to the officers who testified at the hearing, they visited the Apartment only to issue a "friendly warning" about the use of marijuana — that is, merely to speak to the occupants about the complaint — and did not intend to arrest anyone.  (Tr. 243; *see* Tr. 87, 194, 196).  They did, however, bring a prisoner van with them (allegedly because of other visits planned for the same night).  (Tr. 277, 330-31).

The officers took the elevator to the fourth floor of 2825 Claflin Avenue and proceeded toward the Apartment, which was located at the end of the hall, next to a staircase.  (Tr. 195, 297, 394).  The hallway was empty except for Crespo, her boyfriend Juan Carlos Custodio, and their three-year-old daughter, who were walking toward the elevator.  (Tr. 89, 195, 296, 424).

6

Who said what at that point is somewhat unclear, but ultimately immaterial.  According to Detectives Smyth and Rojas, one of the officers asked Crespo whether she lived in the building and she responded that she did, specifically in the Apartment.  (Tr. 89, 157, 394).  Sergeant Ovando testified that an officer asked Crespo if she was responsible for the Apartment and that she indicated that her mother was; he did not recall Crespo saying that she herself lived in the Apartment.  (Tr. 246-47, 333).  In any event, the officers advised Crespo, in sum and substance, that they were there about a complaint and asked if they could discuss it in the Apartment rather than the hallway to avoid "air[ing] their business" to neighbors.  (Tr. 90, 158).  Crespo said "fine," and then walked with them to the doorway of the Apartment.  (Tr. 90, 158).  Sergeant Ovando testified that he could smell marijuana in the hallway and that the smell grew stronger as he approached the door.  (Tr. 248).  Detective Smyth, however, testified that he did not smell any marijuana in the hallway.  (Tr. 195-96).

Whether or not Crespo said she lived in the Apartment, she did not open the door with a key but rather knocked on the door with the police officers behind her.  (Tr. 91, 248, 347).  According to the officers who testified, a woman, later identified as Delarosa, opened the door and stood with the door ajar.  (Tr. 91-92, 248-49, 397).  Here again, the officers' accounts of what happened next vary.  Detective Smyth testified that Crespo told Delarosa that the police were there to speak with them and that Delarosa then "gave a smirk," threw her hand in the air, opened the door wide, turned her back, and walked into the Apartment.  (Tr. 92-95).  According to Sergeant Ovando, Crespo told Delarosa that the police were there to see their mother, Fadul, and that Delarosa then opened the door wider; he did not recall Delarosa saying anything, smirking, or throwing her hand up in the air.  (Tr. 249, 289, 308).  Finally, Detective Rojas testified that Delarosa said "ok" and "just opened the door."  (Tr. 397.  *But see* Tr. 438 (testifying

7

that he did not recall Delarosa saying anything)).  In any event, all three officers agree that Crespo and her two companions entered the Apartment with Delarosa, followed in turn by the officers.  (Tr. 93, 249, 310, 401).  Detective Smyth, at the rear of pack, remained near the front door.  (Tr. 98, 161).  Detective Rojas walked straight through the foyer into the living room, which was directly across from the front door; Sergeant Ovando walked toward the living room, but remained in the foyer.  (Tr. 251, 401).  Detectives Smyth and Rojas both testified that upon entering the Apartment they detected a "strong" odor of marijuana.  (Tr. 99, 402).

Significantly, the officers' testimony concerning what happened next was not entirely consistent.  First, Detective Smyth testified that, when the officers entered, one male was in the living room and another male, whom Smyth later identified as R.D., was in the foyer right near the living room entrance.  (Tr. 99-100, 163).  According to Detective Smyth, R.D. immediately proceeded to the right (looking from the front door), down a hallway toward the back of the Apartment.  (Tr. 99-100).  (Detective Smyth's testimony was inconsistent as to whether R.D. walked or ran down the hallway.  (Tr. 99-100, 159, 163, 169, 203, 346).)  Detective Smyth testified that, in an effort to intercept R.D., he then cut through the kitchen, which was immediately to the right of the foyer and had one doorway from the foyer and another doorway into the back hallway.  (Tr. 100).  Using an "authority voice" (which he demonstrated in Court and can safely be described as a yell), Detective Smyth repeatedly identified himself as police and ordered R.D. to stop.  (Tr. 101, 347).  R.D. did not stop, but Detective Smyth testified that he caught up with the boy at the doorway of the first bedroom in the hallway ("Bedroom 1"), the door to which was ajar.  (Tr. 101).  R.D. grabbed the bedroom door handle and tried to close the door, but Detective Smyth stopped it with his foot.  (Tr. 101, 174, 208).  Detective Smyth testified that he then sent R.D. — alone — back to the living room to be monitored by the other

officers.  (Tr. 102, 208-09).  Detective Smyth did not, at that point, enter Bedroom 1 and could not see into the bedroom "fully."  (Tr. 102).  He did, however, open the door to see if anyone was inside.  (Tr. 103).  He did not see anyone present, but was able to see a paper cutter and some paper on the bed; he could not identify what the paper was.  (Tr. 179).

Detective Smyth claimed that, at that point, he learned from one of the officers in the living room area that another civilian was in the back of the Apartment taking a shower.  (Tr. 175).  (He testified that, upon entering the Apartment in the first instance, he had heard the sounds of a shower coming from the rear of the Apartment.  (Tr. 99).)  Detective Smyth waited for Detective Larsen, and then "proceeded to do a sweep of the location," which he described as a process "to check the apartment for any individual that might be inside the location, just for our safety, and so there's no misunderstandings if someone comes running out of a closet or anything like that."  (Tr. 102-03).  Detective Smyth testified that they did a sweep "at that time . . . [b]ecause we heard water was running.  We also learned there was another individual who was inside the location.  They stated that their other brother was taking a shower at that time."  (Tr. 103; *see also* 104, 175).  He conceded, however, that he had no reason to believe anyone else was present in any rooms "aside from the brother taking the shower."  (Tr. 104, 115).

According to Detective Smyth, the first place that he and Detective Larsen went as part of their "sweep" was the bathroom, where the shower was running.  (Tr. 103, 176).  Detective Smyth testified that he identified himself as a police officer and asked if anyone was present.  (Tr. 104, 176).  When he got no response, he opened the shower curtain to find the water running but no one in the shower.  (Tr. 105, 176).  According to Detective Smyth, the two officers then proceeded to the rear bedroom ("Bedroom 3"), where they found a male — later identified as Fadul's other fifteen-year-old son and R.D.'s twin, B.D. — lying on one of two beds playing a

video game, with a lit marijuana joint in a nearby ashtray.  (Tr. 105, 116, 177).  Detective Smyth

"directed" B.D. — once again, unaccompanied — to join the others in the living room, and then

proceeded to the middle bedroom ("Bedroom 2").  (Tr. 106, 213-15).  After finding no one in

Bedroom 2, Detective Smyth allegedly returned to Bedroom 1 to do "a secondary sweep,"

checking the closets and looking around the bed.  (Tr. 106, 124, 213-15).  When asked why he

did so, Smyth testified that in his "past experience" he had "found people inside of closets and

stuff like that hiding."  (Tr. 106).  He further noted that, because no one had been in the shower,

he believed that there could have been someone else in the Apartment.  (Tr. 116-17).  It was

during that "secondary sweep" of Bedroom 1 that Detective Smyth saw the gun, counterfeit

currency, and drug paraphernalia, all in plain view.  (Tr. 106-07, 123, 181-82).  Detective Smyth

brought those discoveries to the attention of his supervisor, Sergeant Ovando, who then went into

Bedroom 1 to observe the items for himself.  (Tr. 126)

　　　　Sergeant Ovando's testimony concerning these critical few minutes differed in significant

respects from Detective Smyth's testimony — and was somewhat internally inconsistent as well.

Sergeant Ovando indicated that, after entering the Apartment, he stood in the foyer from which

he could see the civilians in the living room and down the hallway toward the back of the

Apartment.  (Tr. 251, 310-12).  He testified that safety was his "primary" concern at that point —

that he "wanted all the civilians that [they] encountered, that [they] met inside that apartment, to

be in front of [him]."  (Tr. 251; *see also* Tr. 290, 312).  Sergeant Ovando reported that, almost

immediately after they entered, he saw Detective Smyth "rushing" down the hallway from the

foyer to the back of the Apartment.  (Tr. 252).  (Sergeant Ovando testified that Detective Smyth

went directly into the hallway — not through the kitchen.  (Tr. 321).)  Sergeant Ovando

acknowledged that he did not know at the time why Detective Smyth had rushed off, but he said

that Detective Smyth returned shortly thereafter with a "young male" and said "Sarge, you better take a look at this." (Tr. 253). Sergeant Ovando then followed Detective Smyth to Bedroom 1, the door to which was open, where he observed photocopies of money, a bag containing what appeared to be marijuana, and a gun. (Tr. 254-56).

On cross examination, Sergeant Ovando testified that he remembered Detective Smyth saying "something" as he rushed toward the hallway, but he acknowledged that he did not recall "anyone in the living room running towards the back of the apartment" — or even remember "see[ing] a reason why [Detective Smyth] had gone running back." (Tr. 312). Further, he testified that from where he was standing in the foyer he could see "[a]ll the way down the hallway," but that he did not see "anything there." (Tr. 313). Shortly thereafter, however, in response to questions from the Court, Sergeant Ovando modified his testimony to say that Detective Smyth had "go[ne] after" the young male with whom he returned. (Tr. 314-15). But when asked if he had seen that person before he came back with Detective Smyth, Sergeant Ovando testified that he "just [didn't] remember." (Tr. 315). When pressed further, he stated that he did remember someone "rushing towards, towards the back, yes." (Tr. 315). And when asked to reconcile that answer with his earlier testimony, he said he did not remember any civilian residents running towards the back "[b]eing in the living room." (Tr. 316, 319). Finally, Sergeant Ovando testified that he did remember "another male in front" of Detective Smyth, but he did not remember where that male was, did not see him in the foyer, and did not recall the male moving until he saw Detective Smyth moving. (Tr. 319-20).

Finally, Detective Rojas testified that after the officers entered the Apartment, he proceeded through the foyer into the living room where he kept watch over Crespo, Crespo's daughter, Custodio, Delarosa, and a "male Hispanic who was sitting on the couch" (plainly a

reference to Delarosa's boyfriend, Brian Garcia, who was present that night).  (Tr. 401).

Detective Rojas asked Crespo who the owner of the Apartment was; Crespo indicated that her

mother was and stated that her mother was out shopping at the time.  (Tr. 402).  The detective

then asked Crespo if anyone else was in the Apartment, to which Crespo said yes, that someone

was in the back.  (Tr. 402, 433).  Detective Rojas testified that from where he was standing in the

living room, he could not see the rest of the Apartment.  (Tr. 406).  Further, he did not remember

anyone on his team "shout[ing] anything" or "command[ing] anyone to do anything, to stop, to

go somewhere, anything of that sort."  (Tr. 411).  At some point, however, "two young males"

who had been in the back of the Apartment came into the living room "with the other officers."

(Tr. 405-06).  On cross examination, Detective Rojas modified this account slightly, indicating

that, after Crespo told him that someone else was present in the Apartment, he sent her with an

officer "to retrieve that individual."  (Tr. 434).  He testified that Crespo and the officer then

returned with "one of the . . . 15 year old boys," whom he had not seen before.  (Tr. 435).

Indeed, he indicated that, aside from Crespo, Crespo's daughter, Custodio, Delarosa, and the

male Hispanic, he had not seen anyone in the "living room area" when he entered.  (Tr. 434-35).

What transpired after the police officers observed the gun and other contraband in

Bedroom 1 can be summarized briefly.  Sergeant Ovando decided to await Fadul's return before

engaging in a more thorough search of the premises.  (Tr. 127).  All three officers who testified

at the hearing indicated that, shortly thereafter, Fadul and Garcia returned home with groceries.

(Tr. 127-28, 182, 321-22, 403, 406).  When asked, Sergeant Ovando and Detective Rojas stated

that they did not recall Fadul and Garcia returning with one of Fadul's twin sons.  (Tr. 322, 435).

(Detective Smyth was not asked.)  In the kitchen, the officers told Fadul what they had found in

Bedroom 1 and asked for her consent to search the Apartment.  (Tr. 129, 184, 259, 325).  Fadul

allegedly consented orally and agreed to sign a consent-to-search form (which she later did). (Tr. 130-32, 260-61; GX 3). The officers then returned to Bedroom 1 and engaged in a more thorough search. (Tr. 133-34). When the officers found even more evidence, Sergeant Ovando decided to stop the search to obtain a search warrant, on the theory that a warrant was "more credible" and "holds more authority" than consent. (Tr. 133-34, 262). The officers arrested everyone in the Apartment (other than Crespo's three-year-old daughter) and took them to the police precinct, leaving Detective Rojas behind to secure the Apartment. (Tr. 137, 407). Later that night, Detective Larsen obtained a search warrant from a state court judge based on what the officers had observed during their sweep. (Tr. 134, 143, 262; GX 15). In a subsequent search of the Apartment, the officers seized the gun, the photocopy machine and paper cutter, drugs, drug paraphernalia, and counterfeit United States currency, among other evidence. (Tr. 145-46, 263).

### 2. Defendants' Case

As noted, Defendants called only one witness: Celeste Crespo, Fadul's daughter and Delarosa's sister. (Tr. 474-75). Crespo testified on direct examination that, as of September 10, 2012, she had not lived in Fadul's apartment for approximately four or five years. (Tr. 478). That evening, however, she was visiting the Apartment with her boyfriend, Custodio, and their three-year-old daughter. (Tr. 479). Also present were Fadul; Kenny Garcia; Delarosa; Delarosa's boyfriend, Brian Garcia; and Fadul's twin sons, R.D. and B.D. (Tr. 479). According to Crespo, they were "[j]ust hanging out"; she stated that no one was smoking marijuana. (Tr. 479). At about 10:30 or 11 p.m., Fadul, Kenny Garcia, and R.D. left to go food shopping. (Tr. 480). About one half hour later, Crespo left with Custodio and their daughter, and they encountered four police officers coming out of the elevator. (Tr. 480, 483). The officers asked Crespo if she had just come out of Apartment 4K, and she indicated that she had. (Tr. 483).

They indicated that there had been "a marijuana complaint," and asked who owned the Apartment. (Tr. 483-84). Crespo stated that no one had been smoking marijuana and identified her mother as the owner of the Apartment. (Tr. 483-84).

According to Crespo, the police officers indicated that they needed proof that Fadul owned the Apartment, and asked for a utility bill. (Tr. 484). Crespo then walked with them to the Apartment, where she knocked on the door. (Tr. 484-85). Delarosa opened the door, and Crespo told her that the police were there to investigate a marijuana complaint and needed a utility bill. (Tr. 486). According to Crespo, Delarosa did not know what a utility bill was, and asked the police several times whether they had a warrant; the officers responded that they were just there to do their job and asked to enter. (Tr. 486-88). According to Crespo, when Delarosa refused, the police officers "just barged in" with Crespo, Custodio, and their daughter in front of them. (Tr. 488-89).[4] The officers directed Delarosa, Crespo, and Custodio to the living room, where Brian Garcia was already. (Tr. 489). According to Crespo, "a big white cop, bald" (plainly a reference to Detective Smyth) and two other officers (presumably Detective Larsen and Sergeant Ovando) immediately walked towards the back of the apartment. (Tr. 492-93, 556). She then heard the sounds of "[d]oors opening, drawers opening, slamming," as if "the house was being searched." (Tr. 493-94).[5] Within a minute at most, Crespo's brother B.D. came to the living room. (Tr. 492). Forty-five minutes or so later, Fadul, Kenny Garcia, and R.D. returned home together. (Tr. 494). Crespo testified that, during the time the officers were in the

---

[4]     Substantially consistent with Crespo's testimony on this score, Delarosa swore in her affidavit that she "repeatedly" asked the police officers if they had a warrant and that, without responding and without permission, the officers then "pushed Celeste [Crespo] and her boyfriend into the apartment, and entered behind them." (Docket No. 48-1, Ex. E, ¶¶ 4-5).

[5]     Notably, although Detective Smyth testified that he had searched a closet in Bedroom 1 during his "secondary sweep" of the Apartment, Crespo testified that there was no closet in Bedroom 1 at all. (*Compare* Tr. 125 *with* Tr. 496). Neither side, however, submitted extrinsic evidence to resolve the discrepancy.

Apartment, there was no "male in the apartment who ran from the living room area . . . down the hallway towards the back bedroom."  (Tr. 497; *see also* Tr. 570).

On cross examination, the Government principally sought to impeach Crespo's testimony using testimony that she had given before a grand jury on March 22, 2013.  (GX 33).  Most significant for present purposes, when asked in the grand jury who had been "in the house" the day the police came, Crespo had testified: "My sister, my *brothers* and my daughter's father and my sister's boyfriend [Brian Garcia]." (GX 33, at 10 (emphasis added)).  At the hearing, Crespo acknowledged that she had said her "brothers plural were in the apartment at the time that the cops got there" (Tr. 519-20); on redirect, she claimed that she had done so because she was "so confused and scared" at the time of her grand jury testimony.  (Tr. 572).  The Government also introduced evidence that, when asked in the grand jury about whether her mother and Kenny Garcia returned home while the police were there, Crespo had answered "[y]es," and "never mentioned . . . that [R.D.] was with them."  (Tr. 576; GX 33, at 10).  Finally, to the extent relevant here, the Government elicited the fact that Crespo had met with the prosecutor and the case agent (from the United States Secret Service), and communicated directly with the case agent on other occasions, but never mentioned anything about the officers barging into the Apartment.  (Tr. 505-12).  Whether that information would have been responsive to anything the prosecutor or the case agent asked Crespo, however, was and is unclear.

## LEGAL PRINCIPLES

### A.  The Protective-Sweep Doctrine

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. As the Supreme Court has repeatedly made clear, "[i]t is a basic principle of Fourth Amendment

law that searches and seizures inside a home without a warrant are presumptively unreasonable."
*Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotation marks and citations
omitted); *see, e.g.*, *Fernandez v. California*, 134 S. Ct. 1126, 1132 (2014); *Kentucky v. King*, 131
S. Ct. 1849, 1856 (2011).  That presumption, however, is rebuttable, *see, e.g.*, *King*, 131 S. Ct. at
1856, as "[t]he touchstone of the Fourth Amendment is reasonableness, and the reasonableness
of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an
individual's privacy and, on the other, the degree to which it is needed for the promotion of
legitimate governmental interests,'" *United States v. Knights*, 534 U.S. 112, 118-19 (2001)
(quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)); *accord In re Terrorist Bombings of
U.S. Embassies in E. Africa*, 552 F.3d 157, 173 (2d Cir. 2008) ("[W]arrantless searches of
homes, while subject to special scrutiny, are nevertheless also subject to a balancing test —
weighing an individual's expectation of privacy against the government's need for certain
information — for determining reasonableness under the Fourth Amendment.").

 In applying these principles, the Supreme Court has established various exceptions to the
warrant requirement.  The Court has held, "for example, that law enforcement officers may make
a warrantless entry onto private property to fight a fire and investigate its cause, *Michigan v.
Tyler*, 436 U.S. 499, 509 (1978), to prevent the imminent destruction of evidence, *Ker v.
California*, 374 U.S. 23, 40 (1963) (plurality opinion), or to engage in 'hot pursuit' of a fleeing
suspect, *United States v. Santana*, 427 U.S. 38, 42, 43 (1976)."  *Brigham City*, 547 U.S. at 403.
Warrantless searches are also allowed "in connection with valid arrests."  *Terrorist Bombings*,
552 F.3d at 168 (citing *Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979)); *but cf. Payton v. New
York*, 445 U.S. 573 (1980) (holding unconstitutional the warrantless arrest of suspect in his
home).  And most relevant to this case, the Court has made clear that the police may search a

home without a warrant based on either "the voluntary consent of an individual possessing authority," *Georgia v. Randolph*, 547 U.S. 103, 109 (2006); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 228-32 (1973), or where the search qualifies as a "protective sweep," defined as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others," *Maryland v. Buie*, 494 U.S. 325, 327 (1990).

*Buie*, the source of the protective-sweep doctrine, involved the execution of an arrest warrant in the home of Edward Buie, who was suspected of armed robbery. As the police officers had both a warrant for Buie's arrest and probable cause to believe that he was in his home, they were "entitled to enter and to search anywhere in the house in which Buie might be found." *Id.* at 333. The question in *Buie* was whether, and under what circumstances, the police could go further and conduct a search of a home even after the target of an arrest is taken into custody. The Court concluded that arresting officers are "permitted . . . to take reasonable steps to ensure their safety after, and while making, the arrest." *Id.* at 334. More specifically, the Court approved two types of warrantless searches. First, "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* Second, the officers could engage in a broader sweep if there were "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* The Court emphasized, however, that such a protective sweep is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335. Further, it may last "no

longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36.

*Buie* involved an in-home arrest pursuant to an arrest warrant, and the Supreme Court has never had occasion to consider the protective-sweep doctrine outside of that context.   The Second Circuit, however, has extended the doctrine to allow a protective sweep where entry was made by the police pursuant to "lawful process, such as an order permitting or directing the officer to enter for the purpose of protecting a third party." *United States v. Miller*, 430 F.3d 93, 95 (2d Cir. 2005).  In doing so, the Second Circuit emphasized the *Buie* Court's recognition "that when officers are inside a home — ordinarily an enclosed, unfamiliar space — they are particularly vulnerable to surprise attacks." *Id.* (citing *Buie*, 494 U.S. at 333).  Further, the Supreme Court's "paramount concern . . . was not why the officers were present in the home, but rather, why the officers might fear for their safety and what they could do to protect themselves." *Id.* at 98-99.  It follows, the Court of Appeals reasoned, that the protective-sweep doctrine "applies with equal force when officers are lawfully present in a home for purposes other than the in-home execution of an arrest warrant, at least where their presence may expose the officers to danger that is similar to, or greater than, that which they would face if they were carrying out an arrest warrant." *Id.* at 99.  Indeed, "[t]he restriction of the protective sweep doctrine only to circumstances involving arrests would jeopardize the safety of officers in contravention of the pragmatic concept of reasonableness embodied in the Fourth Amendment." *Id.* at 100.

## B.  The Protective-Sweep Doctrine and Consent Entries

### 1.  The Circuit Split

Although the Second Circuit held in *Miller* that the protective-sweep doctrine extends beyond the arrest warrant context, it has not resolved whether it applies where, as in this case, the

police allegedly gained entry in the first instance by consent.  *See United States v. Hassock*, 631 F.3d 79, 87 (2d Cir. 2011).  Complicating matters, the other Courts of Appeals are divided on the issue (and the Ninth Circuit is divided unto itself).  Some courts, citing the *Buie* Court's definition of a protective sweep as "'a quick and limited search of premises, *incident to an arrest* and conducted to protect the safety of police officers or others,'" have held categorically that the doctrine does not apply to consent searches.  *United States v. Reid*, 226 F.3d 1020, 1027 (9th Cir. 2000) (quoting *Buie*, 494 U.S. at 327) (emphasis added); *accord United States v. Torres-Castro*, 470 F.3d 992, 996 (10th Cir. 2006).  Other courts have held the opposite, reasoning that when officers are lawfully present in a home pursuant to consent "circumstances can give rise to equally reasonable suspicion of equally serious risk of danger of officers being ambushed by a hidden person as would be the case were there an arrest."  *United States v. Gould*, 364 F.3d 578, 585 (5th Cir. 2004) (en banc); *accord United States v. Garcia*, 997 F.2d 1273, 1282 (9th Cir. 1993); *United States v. Patrick*, 959 F.2d 991, 996-97 (D.C. Cir. 1992); *United States v. Holland*, 522 F. App'x 265, 276 (6th Cir. 2013) (unpublished opinion).

The Fifth Circuit's decision in *Gould* is illustrative of the latter view.  In *Gould*, police officers had gone to a mobile home in the hopes of questioning the defendant about a threat to kill two judges.  *See* 364 F.3d at 590.  Another resident of the trailer consented to the officers' entry, and indicated that the defendant was probably asleep in his bedroom.  *See id.* at 588.  Although the resident had no authority to consent to a search of the defendant's bedroom, the officers entered it for safety reasons and found rifles that later became the subject of the defendant's motion to suppress.  *See id.*  On appeal, the Fifth Circuit upheld the search as a valid protective sweep.  Emphasizing the "balancing principle" underlying the Supreme Court's Fourth Amendment jurisprudence and *Buie*'s "heavy reliance" on cases that did not involve

arrests, the Court held that "arrest is not always, or *per se*, an indispensable element of an in-home protective sweep." *Id.* at 584.  More specifically, the Court declined "to adopt any across-the-board rule that a protective sweep can never be valid where the initial entry to the home is pursuant to consent, even where the consent does not of itself legally authorize the entry into the area swept." *Id.* at 590.  The Court reasoned that "[a]ny such rule either would require officers to forego any and all consent entries or would prevent them, once having so entered, from taking reasonable, minimally intrusive, means for self-protection when reasonable suspicion of the danger of ambush arises. . . .  [T]he Fourth Amendment imposes no such Hobson's choice." *Id.*

Significantly, although the Fifth Circuit concluded that a protective sweep following a consent entry can be lawful, it explicitly cautioned that such searches

> pose Fourth Amendment concerns not present in cases where the initial entry is pursuant to a warrant.  For example, concerns might arise respecting a consent to entry requested for a stated common purpose but actually intended not for that purpose but rather for the purpose of gaining access in order to then make a protective sweep of the entire home for unrelated reasons and thus circumvent the warrant requirement.  Concerns of a similar character might also arguably arise where the consent to entry is given expressly or implicitly only as to a limited area but the protective sweep extends clearly beyond that area *without* anything having developed since entry suggestive of greater or more imminent danger than that initially apparent just prior to entry.

*Id.* at 589.  Despite its concerns, the Court ultimately saw no need to "resolve hypothetical cases of those varieties," concluding that the concerns were "not meaningfully implicated" on the facts of the case.  *See id.*  The Court proceeded to find the protective sweep proper.  *See id.* at 591-93.

### 2.  The Second Circuit's Trilogy of Consent Entry Cases

Although the Second Circuit has not come down on either side of the Circuit split, it has been confronted with protective sweeps where law enforcement initially gained entry by consent on three occasions.  *See United States v. Moran Vargas*, 376 F.3d 112, 113-14 (2d Cir. 2004); *United States v. Gandia*, 424 F.3d 255, 258-59 (2d Cir. 2005); *Hassock*, 631 F.3d at 81-82.  In

the first such case, *Moran Vargas*, the defendant allowed agents from the Drug Enforcement Administration, investigating a tip about a potential drug courier, to enter his hotel room. *See* 376 F.3d at 113. The agents briefly looked around the room, found nothing, and then began interviewing the defendant. During the interview, one of the agents noticed that the bathroom door was ajar and indicated to the defendant that he was going to open the door; the defendant "quickly shut the bathroom door, telling the agents that they could not use his bathroom." *Id.* One of the agents then opened the bathroom door and found heroin in the bathtub. *See id.* In opposing the defendant's motion to suppress, the Government conceded the lack of probable cause and consent to enter the bathroom, but argued that the search "was a protective sweep justified by the agents' reasonable suspicion that Moran was a drug courier and that someone posing a danger to them could have been hiding in the bathroom." *Id.* at 113-14. On appeal, the Second Circuit held that it did not need to decide whether the protective-sweep doctrine extended to initial entries based on consent because, even if it did, "the agents' search failed to meet the requirements set forth in *Buie* for conducting such a sweep." *Id.* at 115.

As an initial matter, the *Moran Vargas* Court easily rejected the Government's argument that the agents' search of the bathroom was permissible under *Buie*, even without probable cause or reasonable suspicion, because the bathroom immediately adjoined the place where the defendant was questioned and ultimately arrested. The *Buie* Court's "justification for permitting a suspicionless search of 'spaces immediately adjoining the place of arrest,'" the Circuit explained, "was the danger inherent in taking a person into custody in a home. Here, there was no arrest prior to the search of [the defendant's] bathroom and, therefore, [that] type of warrantless search described by *Buie* [did] not apply." *Id.* (quoting *Buie*, 494 U.S. at 333-34). Nor did the broader category of search authorized by *Buie* apply, because the record did not

"provide sufficient articulable facts that would warrant a reasonably prudent officer to believe that an individual posing a danger to the agents was hiding in the bathroom of [the defendant's] motel room." *Id.* at 116. Dismissing the Government's arguments about drug traffickers as "generalizations" that, "without more," were "insufficient," the Court emphasized that "[n]o facts *specific* to this case support a finding that the agents reasonably believed (1) that anyone other than [the defendant] was present inside the motel room, *or* (2) that anyone so concealed posed a danger to their safety." *Id.* (emphases added). Moreover, the Court noted, "[n]ot only was there no objective basis to warrant a reasonable suspicion of danger from a second person, there was also no evidence of subjective fear on the part of the agents." *Id.* The agents "did not attempt the most basic of protective maneuvers" — patting down the defendant — and did not manifest any suspicion that someone was in the bathroom until the defendant denied consent to search it, an "exercise of his constitutional right to revoke or limit the scope of a search to which he ha[d] consented" that could not, without more, give rise to a reasonable suspicion. *Id.*

The Court of Appeals reached a similar conclusion in *Gandia*. In that case, police officers responded to a reported dispute between the defendant and the superintendent of the building where he resided, during which the defendant allegedly wielded a gun. *See* 424 F.3d at 257-58. Thereafter, the officers asked the defendant if they could go to his apartment to discuss what had happened. According to the officers, they did so because it was raining, to separate the defendant from the superintendent, and "because they had insufficient privacy while in front of the building to conduct an interview." *Id.* at 258. When the defendant agreed, the officers escorted him to the apartment and entered after he indicated that no one else was present. *See id.* at 258. Although the officers had neither requested nor received permission to search the apartment, one of the officers entered the living room to a position in which he could see the

"whole apartment," later explaining that he did so "for 'safety reasons' because, despite having been told otherwise by [the defendant], he did not know whether there were other people in the apartment." *Id.* at 258-59.  From that vantage point, the officer observed a .45 caliber bullet in plain view, which led to a broader search and, eventually, a search warrant that resulted in the discovery of a gun and additional ammunition.  *See id.* at 259-60.

The district court upheld the search as a valid protective sweep, but the Second Circuit concluded otherwise.  Quoting from the Fifth Circuit's cautionary words in *Gould*, the Court "note[d] that when police have gained access to a suspect's home through his or her consent, there is a concern that generously construing *Buie* will enable and encourage officers to obtain that consent as a pretext for conducting a warrantless search of the home." *Id.* at 262.  As in *Moran Vargas*, however, the Court declined to reach the legal question of whether the protective-sweep doctrine applies in the case of a consent entry, concluding that there was "nothing in the record from which a reasonable police officer could have inferred that there was a specific danger of unknown third-parties hiding in [defendant's] apartment." *Id.* at 264.  Notably, the Court stressed that "there was no need for the police officers to enter [the defendant's] home in the first place," that they "were there for their own convenience (and perhaps for his)," and that "the entrance or hallway of the building, or their own police vehicle, would have fulfilled their stated purposes." *Id.* at 263.  In other words, "[t]he officers could have avoided 'the disadvantage of being on his adversary's "turf,"'" by simply interviewing [the defendant] elsewhere." *Id.* (quoting *Buie*, 494 U.S. at 333).  The Court acknowledged that the police officers "were not required to take [the defendant] at his word when he told them that he lived alone, nor to infer that there was no one else in the apartment when they entered.  But they also had no evidence to the contrary that would indicate a third person might be hiding there."

*Id.* at 254.  "Lack of information," the Court declared, "cannot provide an articulable basis upon which to justify a protective sweep."  *Id.* (internal quotation marks omitted).

In *Hassock*, the Circuit once again avoided deciding the legal question of whether (or when) a protective sweep can be conducted after an initial entry based on consent.  In that case, law enforcement agents received information from a confidential source that a man identified only as "Basil" was involved in marijuana trafficking, had been deported from the United States, and illegally possessed a firearm.  *See* 631 F.3d at 81.  Agents then went to the apartment where the confidential source said "Basil" lived, with the intention of speaking with "Basil" and "potentially" arresting him.  *Id.*  A woman answered the door; when asked who was there, she said she did not know because she had been asleep and indicated that the agents could "look around."  *Id.* at 82.  Without ascertaining her authority to consent to a search, the agents entered the apartment, which one later described as "pretty small," and proceeded directly to the bedroom that the confidential source had linked to "Basil."  *See id.*  As he approached, one agent "had his gun drawn (or had his hand on his gun), being concerned that Basil 'could come out with a firearm or a gun or pose a danger.'"  *Id.*  Although "Basil" — later identified as the defendant — was not inside the bedroom, the agent did find a firearm under the bed.  *See id.* After that discovery, the agents remained in the apartment for a couple more hours, during which time they interviewed the woman who had answered the door; she told them that she had lived in the back bedroom for about one month and that "Basil," whose full name was unknown to her, occupied the front bedroom that had been searched by the agents.  *See id.*

On appeal, the Second Circuit rejected the Government's argument that the firearm was seized during a lawful protective sweep.  The Court acknowledged both that the agents went to the apartment with a "legitimate purpose" (namely, questioning and possibly arresting the

defendant) and that "it may have been objectively reasonable for agents to think that [the defendant's] presence on the premises posed a danger to their safety."  *Id.* at 88.  "But," the Court stressed, "a protective sweep is reasonable only to safeguard officers in the pursuit of an otherwise legitimate purpose," and when the defendant did not answer the door, the agents' "purpose could not be pursued until [the defendant] was found."  *Id.*  Under those circumstances, the Court reasoned, the sweep could not "be viewed as a reasonable security measure incident to [the defendant's] interrogation or arrest.  Instead, the 'sweep' itself became the purpose for the agents' continued presence on the premises . . . ."  *Id.*  The Court declared that "[w]here no other purpose is being pursued, a sweep is no different from any other search and, therefore, requires a warrant, exigency, or authorized consent, none of which were present here."  *Id.*; *see also id.* at 89 ("In pressing past the sole known occupant of the apartment and going forward with the search of the apartment, the purpose of the agents was to locate [the defendant] and *then* to return to their initial purpose of talking to him.  Under the circumstances, the officers undertook a full search for the object of their inquiry rather than a protective sweep incident to an *independent* lawful purpose." (latter emphasis added)).

### 3. A Modified Protective-Sweep Doctrine for Consent Entries

As the foregoing discussion makes clear, the Second Circuit has not definitively resolved whether, and under what circumstances, the police may engage in a protective sweep after gaining entry to a home based upon consent.  Nevertheless, its cases, when considered in conjunction with *Gould*, point the way toward a modified protective-sweep doctrine in such circumstances.  Put differently, they call for extending the protective-sweep doctrine to consent entries, but they also make clear that *Buie* cannot, and should not, be applied unequivocally to such searches, as the Government in this case occasionally appears to suggest.

To begin with, as the Government itself conceded at oral argument (Mar. 13, 2014 Tr. 29-30), the first type of search authorized in *Buie* — a search, "without probable cause or reasonable suspicion," of "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched," 494 U.S. at 334 — does not apply at all to consent entries. The Second Circuit held as much in *Moran Vargas*, when it noted that the *Buie* Court's justification for permitting such suspicionless searches "was the danger inherent in taking a person into custody in a home," which "does not apply" in the absence of "arrest *prior to* the search." 376 F.3d at 115 (emphasis added); *see also United States v. Rudaj*, 390 F. Supp. 2d 395, 405 n.2 (S.D.N.Y. 2005) (noting that the *Gandia* Court applied only the "heightened standard, limited in *Buie* to more far-reaching protective sweeps"). Moreover, a contrary rule would plainly undermine the principle that a person can limit his or her consent to search to a particular area, *see, e.g.*, *Florida v. Jimeno*, 500 U.S. 248, 252 (1991) ("A suspect may of course delimit as he chooses the scope of the search to which he consents."), and would "enable and encourage officers to obtain . . . consent as a pretext for conducting a warrantless search of the home," *Gandia*, 424 F.3d at 262.

Next, the broader type of search authorized by *Buie* — where officers have a reasonable suspicion that a person posing a threat is present elsewhere on the premises — should be permitted, but only where the justification for such belief arises (or at least crystallizes) *after* entering the home. Put differently, a broader search should be allowed, but only where the search is based, at least in part, on facts and circumstances that become known to the officers after they enter the home. To categorically prohibit protective sweeps when the initial entry was based on consent would, as the Second Circuit put it in *Miller*, "jeopardize the safety of officers in contravention of the pragmatic concept of reasonableness embodied in the Fourth

Amendment." 430 F.3d at 100. Alternatively, faced with such a broad prohibition, police officers might well forgo consent entries altogether — presenting what the Fifth Circuit described as a "Hobson's choice" that is not compelled by the Fourth Amendment. *Gould*, 364 F.3d at 590. At the same time, requiring the police to articulate facts and circumstances that become known after their entry helps ensure that "the officers have a non-pretextual reason for entering the premises" in the first instance. *Gandia*, 424 F.3d at 263 (observing that "pretext may be less likely when police enter a home . . . upon probable cause combined with exigent circumstances, or pursuant to the 'danger exception' to the normal requirement that officers knock and announce themselves," as "the presence of emergent conditions in effect assures that the officers have a non-pretextual reason for entering the premises" (citation omitted)).

By contrast, where a reasonable officer on the scene could have or should have possessed a reasonable suspicion *before* entering a person's home, a broader search would not be consistent with the Fourth Amendment's balancing test. Allowing such searches would squarely implicate the "concern" expressed by the Second Circuit in *Gandia*, as it would "enable and encourage officers to obtain . . . consent as a pretext for conducting a warrantless search of the home." *Id.* at 262; *accord Gould*, 364 F.3d at 589. Moreover, it is significant that, in such circumstances, the police officer is not "compelled to enter," *Miller*, 430 F.3d at 99, but rather chooses to enter in spite of his or her knowledge of the risks faced in doing so. *See Gandia*, 424 F.3d at 263 (holding that police officers unlawfully engaged in a protective sweep in part because "there was no need for [them] to enter [the defendant's] home in the first place"); *cf. Rudaj*, 390 F. Supp. 2d at 404-06 & n.2 (holding that *Buie* applies in full force where law enforcement officials are "under a legal duty that require[s] warrantless entry"). Being in a home may well "put[] the officer at the disadvantage of being on his adversary's 'turf,'" *Buie*, 494 U.S. at 333, but it would

27

not be reasonable to allow an officer who voluntarily enters a home knowing of a specific risk of

ambush to override the limited scope of the homeowner's consent to enter or search without a

reasonable belief of some new danger or a reasonable belief, based on one or more new specific

and articulable facts, that the risk is materially greater than previously appreciated.

### DISCUSSION

The Court turns then to the instant case.  As an initial matter, although much is disputed

in this case, there are several issues that are not in dispute.  First, as the Government concedes,

all three moving Defendants have standing to challenge the search of the Apartment — Fadul

and Delarosa because they resided in the Apartment and Garcia because he was an overnight

guest.  (Mar. 13, 2014 Tr. 4).  *See also United States v. Snype*, 441 F.3d 119, 130 (2d Cir. 2006)

(holding that the defendant, as "an overnight guest[,] . . . shared in his host's legitimate

expectation of privacy in the premises").  Second, the Government does not contend that consent

or exigent circumstances justified the police officers' search of the Apartment prior to Fadul's

return from the store.  (Mar. 13, 2014 Tr. 4-5).  Instead, the Government relies solely on the

protective-sweep doctrine to justify that search.  Third, as the Government concedes, for the

search — and resulting seizures — to be upheld, the Government would have to show *both* (1)

that the police lawfully gained entry to the Apartment pursuant to the consent of a person with

authority to consent; *and* (2) that the initial search of the Apartment — during which the police

allegedly saw the gun and other contraband in plain view — was justified under the protective-

sweep doctrine.  (Mar. 13, 2014 Tr. 6-7).[6]  Put another way, if the Government fails to carry its

---

[6]     That is, in the absence of both valid consent to enter and a proper protective sweep,
neither Fadul's later consent to search the Apartment nor the search warrant would save the
search, as both were fruit of the protective sweep, and the protective sweep was was, itself, a
fruit of the initial consent entry.  As the Government concedes, Fadul's consent was induced in
part by the officers' confronting her with the fact that they had discovered the gun and other

burden of showing either valid consent to enter or a proper protective sweep thereafter,

Defendants' motion to suppress must be granted. *See United States v. Kiyuyung*, 171 F.3d 78, 83

(2d Cir. 1999) (stating that the burden of showing that a search "fell within one of the exceptions

to the warrant requirement is on the government").

The Court finds that the Government has failed to carry its burden of justifying the search

as a lawful protective sweep, and thus does not reach the question of whether the initial entry

was in fact based on valid consent. As an initial matter, the Court declines to credit Detective

Smyth's testimony about R.D. — namely, that upon seeing the police enter the Apartment, he

made a break down the hallway and tried to close the door to Bedroom 1 — or the other officers'

testimony to the extent it is consistent with Detective Smyth's. The Court does not reach that

conclusion lightly, but does so for several reasons in addition to an assessment of the witnesses'

demeanor.[7] First, as discussed above, Detective Smyth's testimony on that critical issue was

---

contraband in Bedroom 1. (Mar. 13, 2014 Tr. 6-7). And the police procured the search warrant
based on what they had seen during their earlier search. (GX 15).

[7]     Significantly, this is not the first case in which colorable questions have been raised about
the conduct and credibility of some of the officers involved in the search. At the time of the
hearing, Detective Larsen had been placed on modified duty under suspicions of perjury in
connection with a narcotics arrest in July 2012, based on apparent inconsistencies between his
testimony about the arrest and video surveillance of the same event; Sergeant Ovando was under
investigation in connection with that same arrest, for failure to properly supervised Detective
Larsen by signing off on certain arrest-related paperwork prepared by him. (Letter from AUSA
Edward Diskant, Dec. 18, 2013, at 1-3 ("Diskant Letter") (filed under seal); *see also* Tr. 82-86,
148-51, 196-202, 263-68, 285-89, 301-02). Presumably as a result, the Government did not call
Detective Larsen as a witness at the hearing. In fact, the Government advised that, if called as a
witness, Detective Larsen "would be likely to invoke his Fifth Amendment privilege" about the
incident. (Diskant Letter at 2 n.1).
        In addition, the Civilian Complaint Review Board (the "CCRB") found that, in
connection with a narcotics arrest in August 2012, Sergeant Ovando and Detective Rojas had
unlawfully engaged in a warrantless search of an apartment that they had claimed was based on
consent. (Diskant Letter at 3-4; *see also* Tr. 268-74, 282-85, 291-95, 297, 297-300, 412-29; GX
31). Even more significant for present purposes, the CCRB found that Detective Rojas gave a
"false official statement" in his interview about the incident when he denied having entered the
arrestee's bedroom. (Diskant Letter at 4; *see also* Tr. 416; GX 31-32). These incidents — and

inconsistent in significant respects with the testimony of Sergeant Ovando and Detective Rojas. Notwishstanding the internal inconsistencies in Sergeant Ovando's testimony, it is plain — and the Court finds — that he did not see anyone, let alone R.D., break for the back of the Apartment from the vicinity of the living room.  On both his own and Detective Smyth's accounts, Sergeant Ovando was standing in a location that would have given him a clear view of R.D. if he had been where Detective Smyth claims.  (Tr. 165-69, 203, 251, 310-13; GX 1A).  Further, Sergeant Ovando testified that safety — and keeping all the civilians in the Apartment in front of him — was his "primary" concern.  (Tr. 251, 290, 312).  Yet he acknowledged that he did not remember "see[ing] a reason why [Detective Smyth] had gone running back" (Tr. 312); did not see "anything" down the hallway despite a clear view (Tr. 313); and had not previously seen the young male who allegedly returned with Detective Smyth, either in the foyer or otherwise.  (Tr. 315, 319-20).  Nor did Sergeant Ovando corroborate Detective Smyth's claim that he yelled "Stop, police!" several times as he chased R.D. down the hallway.

Although Detective Rojas was not in as good a position as Sergeant Ovando to see what, if anything, happened in the foyer and hallway, he too gave no indication of there being anyone other than Crespo, Custodio, their daughter, Delarosa, and Brian Garcia in or near the foyer when the police entered.  Further, he testified that he had no recollection of anyone on his team "shout[ing] anything" or "command[ing] anyone to do anything, to stop, to go somewhere, anything of that sort."  (Tr. 411).  To be sure, Detective Rojas's testimony did corroborate Detective Smyth's story insofar as he testified that Detective Smyth returned from the back of

---

the officers' testimony about them at the hearing, which the Court did not find especially credible (in light of, among other things, a review of the CCRB materials themselves (GX 31-32)) — contribute to the Court's doubts about the credibility of the Government's witnesses. Even in the absence of evidence concerning these other incidents, however, the Court would not credit the claim that R.D. was present in the Apartment and made a break for Bedroom 1.

the Apartment with two males.  (Tr. 405-06).  But Sergeant Ovando did not corroborate that important detail (and Detective Rojas himself appeared to recant it on cross-examination).  And in other respects — for instance, his claim that he sent Crespo with an officer to retrieve the person she said was in the back of the Apartment and his claim that the two males entered the living room together — Detective Rojas's testimony was itself fundamentally at odds with his partners' accounts.  The bottom line is that, given Sergeant Ovando's superior vantage point (one that was closer to where R.D. allegedly stood and had a clear view of the hallway) and the officers' self-professed concerns for their safety, it is not credible that, if events took place as Detective Smyth described, they would not have either seen (and remembered) R.D. break for the back of the Apartment or heard (and remembered) Detective Smyth yell for him to stop.

Second, Detective Smyth's story about R.D. breaking down the hallway to the door of Bedroom 1 was contrary to Crespo's testimony and Fadul's sworn declaration that R.D. was not even present in the Apartment when the police arrived.  To be sure, there are reasons to doubt their accounts, starting with their obvious bias.  Not without force, the Government also challenges Crespo's testimony at the hearing by pointing to her seemingly contrary testimony before the grand jury on March 22, 2013.  (Gov't Post-Hearing Br. (Docket No. 132) 12-13).  That earlier testimony, the Government argues, is more believable because it took place "months before" the "key issue" of who was present in the Apartment on September 10, 2012, "had crystal[l]ized."  (*Id.* at 13).  Crespo's relevant grand jury testimony, however, is not quite as "clear and unequivocal" as the Government suggests.  (*Id.*).  Specifically, Crespo testified that her "brothers" plural were present when asked "[w]ho was present in the house *that day*," but she was never unambiguously asked whether they were present *when* the police arrived.  (GX 33, at

10, 29-30 (emphasis added)).[8]  Thus, Crespo could have understood the prosecutor's questions to be asking who was present in the Apartment during the time that the police were there, in which case her reference to both brothers being there would have been unremarkable.[9]

More significantly, by arguing that the importance of R.D.'s presence in the Apartment did not "crystallize" until months after March 2013, the Government inadvertently underscores the significance and reliability of Fadul's declaration — and, by extension, corroborates Crespo's testimony at the hearing.  Fadul signed her declaration — stating that she, Garcia, and R.D. left

---

[8]     In one instance, the prosecutor asked Crespo "[w]ho was present in the house that day?" Crespo responded: "It was — when the cops came?"  When the prosecutor said "yes," Crespo stated: "My sister, *my brothers*, and my daughter's father, and my sister's boyfriend."  (GX 33, at 10 (emphasis added)).  Later, she testified as follows:

> Q.     I want to turn back now to the day September 11th, when the police officers went in to search your mother's apartment at 2825 Claflin. Who was in the apartment that day?  . . . You said you were leaving, so you were there?
> A.     Yes.
> Q.     Your sister [Yasmin Delarosa] was there?
> A.     Yes.
> . . . .
> Q.     Your two brothers [R.D. and B.D.] were there?
> A.     Yes.
> . . . .
> Q.     I think you said your sister's boyfriend was there?
> A.     Yes.  Brian Garcia.
> Q.     I think you also testified —
> A.     My daughter's father was there.
> Q.     Was there anybody else there aside from those people?
> A.     No.  It was just us and my daughter.
> Q.     And your daughter?
> A.     Yes.
> . . . .
> Q.     And your mom, Ms. Fadul, and Kenneth Garcia came later on?
> A.     Yes.

(GX 33, at 29-30.)

[9]     That is not to say that the Court credits Crespo's testimony in all respects.  There is good reason to doubt some of her testimony — for example, about when she moved out of the Apartment.

for the store — on April 23, 2013.[10]  Yet, as the Government concedes, it was not until at least

June 21, 2013, when the Government filed its brief in opposition to Garcia's motion to suppress

in 13 Civ. 257 arguing that the initial search was a lawful protective sweep, that the significance

of R.D.'s presence in the apartment or lack thereof became clear.  (Mar. 13, 2014 Tr. 12).  Prior

to that date, as Garcia's initial motion makes clear, Defendants believed the lawfulness of the

search and seizure turned solely on whether Delarosa had validly consented to the search.  (13

Cr. 257, Docket No. 10; *see also* Mar. 13, 2014 Tr. 43 (defense counsel stating that the

protective sweep issue was not on their "radar screens" prior to the Government's brief filed on

June 21, 2013)).  Given that, Fadul had no conceivable reason to lie when she swore under oath

that R.D. was out with her when the police arrived.[11]  Thus, although the Court need not credit

the affidavit of a defendant who does not testify at a later hearing, *see, e.g.*, *United States v.*

*Polanco*, 37 F. Supp. 2d 262, 264 n.4 (S.D.N.Y. 1999); *United States v. Frank*, 8 F. Supp. 2d

284, 291 n.2 (S.D.N.Y. 1998), the Court does credit Fadul's assertion that R.D. was not present

when the police initially entered the Apartment.[12]

---

[10]     Fadul's counsel represented that Fadul signed her declaration on April 23, 2013.  (Mar. 13, 2014 Tr. 42).  Further, that she would have signed it on that date makes some sense in light of the fact that there was a pretrial conference before Judge Swain on that day and that, until that conference, Fadul's motion deadline was only two days later.  Notably, the Government concedes that it "has no reason to . . . question" that Fadul signed the affidavit on April 23, 2013.  (Mar. 13, 2014 Tr. 13).

[11]     At oral argument, the Government was hard pressed to explain why Fadul would have lied in her affidavit about R.D.'s presence in the Apartment.  (Mar 13, 2014 Tr. 13 ("[W]hy she would include that there is unclear to me.")).  The Government "speculat[ed]" that Fadul might have lied to bolster her argument that she felt pressure to consent to a search of the Apartment based in part on the threat that her children would be arrested.  (Mar. 13, 2014 Tr. 13-14).  As the Court noted, however, that argument cuts the other way, as any pressure Fadul would have felt to consent in connection with her sons being arrested would have been greater had "she arrived back to see that both of her twins were in custody."  (Mar. 13, 2014 Tr. 14).

[12]     It is true, as the Government notes (Mar. 13, 2014 Tr. 16), that Garcia and Delarosa did not mention R.D.'s absence from the Apartment when the police arrived in their affidavits.  (13

Thus, the Court does not credit the Government's evidence that someone — whether R.D. or otherwise — broke for the back of the Apartment after the police officers entered and tried to close the door to Bedroom 1.  The Government argues that, even in the absence of that evidence, the protective sweep was lawful, citing the strong odor of marijuana, the fact that the officers had reason to believe that one or more other people were present in the rear of the Apartment, and the fact that the officers were outnumbered.  (Mar. 13, 2014 Tr. 18-19).  But, as the Government concedes, the police officers were aware of the smell of marijuana before (or immediately after) they entered the Apartment.  (Mar. 13, 2014 Tr. 19, 33).  In addition, the officers knew — or at had reason to believe — that the Apartment was a multiple-occupant, multiple-bedroom dwelling and that they would therefore likely be outnumbered if they entered. (Mar. 13, 2014 Tr. 33, 40).  At a minimum, the officers learned that, in addition to Crespo and Custodio, there were at least two adults inside the Apartment when Delarosa opened the door.

Accordingly, the only fact that the officers really learned upon entering the Apartment was that not everyone was gathered in the living room area — and, notably, they learned that fact promptly and directly from Crespo and Delarosa without any suggestion they were dissembling. *See Gandia*, 424 F.3d at 264 (noting that, while the police officers were not required to take the defendant at his word when he said that he lived alone, "they also had no evidence to the contrary that would indicate a third person might be hiding there"); *cf. United States v. Martins*, 413 F.3d 139, 150-51 (1st Cir. 2005) (citing the officer's reason to disbelieve the information he had been given regarding the presence of others on the premises as a factor supporting a

Cr. 257, Docket No. 9-1, Exs. E & G).  In the Court's view, however, those omissions have little or no significance, as there was no reason to appreciate the importance of R.D.'s presence or absence one way or another at the time they signed their affadivits.  Moreover, Delarosa's affidavit was focused on the circumstances of the police officers' initial entry into the Apartment and did not discuss who else, if anyone, was present when the police arrived beyond Crespo, Custodio, and their daughter.  (13 Cr. 257, Docket No. 9-1, Ex. E).

protective sweep); *United States v. Talley*, 275 F.3d 560, 564 (6th Cir. 2001) (similar).

Moreover, until Detective Smyth searched the bathroom (as part of the protective sweep itself),

all evidence indicated that there was only one other person present in the rear of the Apartment

and that that person was in the shower (*see* Tr. 104 (Detective Smyth conceding that he had no

reason to believe anyone else was present in any rooms "aside from the brother taking the

shower")) — a fact that would hardly "warrant a reasonably prudent officer in believing that"

the rear of the Apartment "harbor[ed] an individual posing a danger."  *Buie*, 494 U.S. at 334.

      Even considered together, the smell of marijuana, the number of civilians present, and the

presence of another person (whether taking a shower or otherwise) does not even come close to

justifying a protective sweep.[13]  On the Government's view, a protective sweep would be

justified any time the police were lawfully present in a home and had reason to believe that

someone elsewhere in the home was using drugs.  (*See* Mar. 13, 2014 Tr. 20 (arguing that

someone using drugs could, if confronted by the police, "react in a harmful way or in a nervous

way or in a startled way")).  But those "generalizations, without more, are insufficient to justify a

protective sweep."  *Moran Vargas*, 376 F.3d at 116.  In fact, those generalizations are even

weaker than the generalizations found wanting by the Second Circuit in *Moran Vargas*, which

were based on prior experiences with drug *traffickers* rather than mere drug *users*.  *See id.*; *see*

*also United States v. Taylor*, 248 F.3d 506, 514 (6th Cir. 2001) (stating that a generalized

suspicion that the defendant was a drug dealer, without more, would not justify a protective

sweep); *United States v. Hatcher*, 680 F.2d 438, 444 (6th Cir. 1982) (holding, pre-*Buie*, that the

---

[13]    Tellingly, at oral argument, the Government effectively conceded that there would have
been no basis for the sweep had the police officers been confronted with the same circumstances
in a nicer neighborhood.  (Mar. 13, 2014 Tr. 38-39).  "Even in high crime areas, where the
possibility that any given individual is armed is significant," however, the Fourth Amendment
"requires reasonable, individualized suspicion before . . . [a] protective sweep of a house" can be
conducted.  *Buie*, 494 U.S. at 334 n.2.

dangers inherent in an in-home arrest for drug trafficking were inadequate, standing alone, to justify a protective sweep); *cf. Martins*, 413 F.3d at 146-51 (holding that the presence of a minor and "thick marijuana smoke" justified a warrantless entry in the first instance, but citing other evidence — and making no mention of the marijuana smoke or the presence of the minor — in holding that a subsequent protective sweep was also lawful).

For similar reasons, the fact that Detective Smyth had, on prior occasions, "found people inside of closets and stuff like that hiding" does not support the broader search.  (Tr. 106).  The police cannot justify a protective sweep simply by citing prior experiences or by invoking standard procedure.  *See United States v. Taylor*, 666 F.3d 406, 409 (6th Cir. 2012); *United States v. Williams*, 577 F.3d 878, 881 n.3 (8th Cir. 2009).  Instead, "*Buie* clearly instructs that protective sweeps must be justified on an individualized basis."  *United States v. Davis*, 471 F.3d 938, 946 n.5 (8th Cir. 2006).  And here, that basis was plainly lacking.  That is, while the officers may have had reason to believe that one other person was present in the Apartment beyond those gathered in the living room, "[n]o facts specific to this case support a finding that the [officers] reasonably believed" that that person (who was believed to be in the shower) "posed a danger to their safety," the *sine qua non* of a protective sweep under *Buie*.  *Moran Vargas*, 376 F.3d at 116; *see United States v. Akrawi*, 920 F.2d 418, 420-21 (6th Cir. 1990) (holding that a protective sweep violated the Fourth Amendment where the searching officers "could point to no particular reason to support a reasonable belief that the [area swept] harbored a dangerous individual").[14]

---

[14]     Notably, when asked at oral argument to cite "any cases that support the proposition that police having a reasonable belief that someone is elsewhere in a home smoking marijuana would support a protective sweep of the rest of the home," the Government contended that there were cases, albeit in the arrest warrant context, holding that a protective sweep was reasonable "just when [the police] think there is someone else [who] could be in an apartment."  (Mar. 13, 2014 Tr. 26).  But the arrest warrant context does make a difference, as there is "danger inherent in taking a person into custody in a home."  *Moran Vargas*, 376 F.3d at 115 (citing *Buie*, 494 U.S.

Although the question would obviously be a closer one, the Court would find that suppression was required even if it did credit Detective Smyth's testimony concerning his chase of R.D. to the door of Bedroom 1.  Significantly, Detective Smyth did not engage in the protective sweep until *after* he had allegedly stopped R.D. and sent him back to the living room area.  (Gov't Post-Hearing Br. 8, 19).  At that point, however, any conceivable threat posed by R.D. himself had plainly been neutralized.  Further, although R.D.'s alleged efforts to close the door to Bedroom 1 no doubt aroused Detective Smyth's suspicions about what might be in the room, they could not provide an objective basis to believe that the officers or others present were in danger.  For one thing, R.D.'s efforts amounted to little more than an "exercise of his constitutional right to revoke or limit the scope of a search" to which consent had allegedly been given, which cannot, without more, give rise to a "reasonable suspicion."  *Moran Vargas*, 376 F.3d at 116.  But more fundamentally, Detective Smyth himself conceded that, at that point, there was no reason to believe anyone was inside Bedroom 1.  (Tr. 104, 115).  And even if there had been a basis in fact to believe, at that point, that Bedroom 1 contained a weapon or contraband — a stretch, to say the least — that fact would not justify a search of the room when no one in the Apartment would have had "ready access" to such a weapon or contraband.  *Gandia*, 424 F.3d at 264; *see also United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005) ("*Buie* authorizes protective sweeps for unknown individuals in a house who may pose a threat to officers . . . ; *Buie* does not allow a protective sweep for weapons or contraband.").

---

at 333-34).  Moreover, the only example of such a case proffered by the Government at oral argument was *Rudaj*, which involved the first category of searches authorized by *Buie* (namely, searches of closets and other spaces immediately adjoining the area of an arrest), *see* 390 F. Supp. 2d at 405-06 & n.2, a category that the Government concedes does not apply where the police gain entry by consent in the first instance.  In its post-hearing memorandum of law, the Government also cited *United States v. Lauter*, 57 F.3d 212, 216-17 (2d Cir. 1995) (Gov't Post-Hearing Br. 19), but it too involved the first category of searches authorized by *Buie*.

Ultimately, "[n]ot only was there no objective basis to warrant a reasonable suspicion of danger from a second person," but, as in *Moran Vargas*, "there was also no evidence of subjective fear on the part of the [police officers]."  376 F.3d at 116.  There is no evidence, for example, that the officers "attempt[ed] the most basic of protective maneuvers" — namely, a pat down — on R.D. or any of the others present in the Apartment.  *Id.* at 117.  And even more telling, after R.D. allegedly tried to close the door to Bedroom 1, Detective Smyth did not immediately search that room.  Intead, he sent R.D. — unaccompanied — down the hallway, and proceeded first to the bathroom, then to Bedroom 3, and then to Bedroom 2.  Further, when Detective Smyth found B.D. in Bedroom 3, the detective allowed him too to proceed unaccompanied to the living room, a route that took B.D. directly past Bedroom 1.  Only *after* searching all of those rooms (and finding nothing that would suggest any sort of threat) did Detective Smyth decide to engage in "a secondary sweep" of Bedroom 1, during which he found the gun and other contraband.  (Tr. 106, 124, 213-15).  At that point, Detective Smyth had not gained any more information that would have warranted a reasonable suspicion of danger in Bedroom 1.  *See Gandia*, 424 F.3d at 264 ("Lack of information cannot provide an articulable basis upon which to justify a protective sweep." (internal quotation marks omitted)).  But more to the point, if R.D.'s actions in allegedly trying to close the door to Bedroom 1 had really prompted suspicion of danger lurking within, it strains credulity to believe that Detective Smyth would have searched the rest of the Apartment before carefully checking that bedroom.

## CONCLUSION

This Court is acutely aware of the need for police officers, if lawfully present in a home, to be given sufficient latitude to take reasonable steps to protect themselves from danger.  At the same time, because intrusions into the home are "the chief evil against which . . . the Fourth

Amendment is directed," *Payton*, 445 U.S. at 585 (internal quotation marks omitted), and because the danger inherent in being on another's turf does not "*ipso facto* justify a protective sweep," *Gandia*, 424 F.3d at 263, a court must be scrupulous in ensuring that a protective sweep is conducted "only when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the . . . scene," *Buie*, 494 U.S. at 336.  A court must be especially scrupulous where, as here, police officers contend that they were allowed entry in the first instance based on consent, as anything less would both enable and encourage officers to obtain that consent as a pretext for conducting a warrantless search and undermine the well-established principle that a person can limit the scope of his or her consent to search to a particular area.

Here, for the reasons stated above, the police officers lacked an objectively reasonable basis to conduct a protective sweep.  At a minimum, that requires suppression with respect to the moving Defendants of the evidence seized within the Apartment on or about September 10, 2012.  Although Defendants suggest that it may warrant suppression of additional evidence as "fruit of the poisonous tree" (Defs.' Post-Hearing Br. (Docket No. 131) 25-27), whether or to what extent that is the case is not clear on the present record.  *See, e.g.*, *United States v. Trzaska*, 111 F.3d 1019, 1027 (2d Cir. 1997) (stating that "to determine whether evidence is a fruit of a poisonous tree, a court must determine whether the government acquired the evidence by exploiting the illegal search or rather by a means sufficiently distinguishable from that search" and that "[t]he burden of showing admissibility rests on the prosecution").  Also unclear is whether suppression with respect to the moving Defendants calls for holding separate trials as to the moving and non-moving Defendants.  Accordingly, all parties (that is, *both* the moving and non-moving Defendants alike) are directed to confer with respect to those questions and any

other implications of this Opinion and Order for the further proceedings to be conducted in this

case, and to appear for a conference with the Court on **April 30, 2014**, at **3:45 p.m.**

      The Clerk of Court is directed to terminate Docket Nos. 47, 57, and 59.


      SO ORDERED.

Dated: April 21, 2014
      New York, New York

                            JESSE M. FURMAN
                     United States District Judge